**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **JIIN KO,** | |
| *Plaintiff,* | **Civ. No.** 1:25-cv-1833 |
| **v.** | |
| **SWIFTLY SYSTEMS, LLC, HENRY KIM, LITTLER MENDELSON P.C., and JEAN SCHMIDT,** | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

**PRELIMINARY STATEMENT**

1.      Jiin Ko joined Swiftly Systems, Inc. ("Swiftly) in 2023 as its Chief People Officer because she was excited for the opportunity to help Chief Executive Officer Henry Kim build a successful startup. Swiftly and Chief Executive Officer Kim, quickly recognized Ms. Ko's potential, and by the end of her second month at the company, Ms. Ko had taken on the additional roles of Chief Financial Officer and managing the Information Technology ("IT") department.

2.      This excitement, however, soon gave way to grim reality. Ms. Ko also learned that Mr. Kim held deeply bigoted views about women, Koreans, and parents and caregivers. He told her that he would prefer to "move the company to Korea" rather than comply with the federal Pregnant Workers Fairness Act, that he would not hire "executives with young children," and that the Company needed workers with a "relentless" and "savage attitude" which he summed up as a "Korean mentality." He also called the Company's accountants at Deloitte "motherfuckers" because they refused to approve the Company's accounting practices, thus impeding his ability to raise new funds from investors. And she further discovered that Mr. Kim had been using Swiftly as a personal piggybank.

3.      Ms. Ko repeatedly complained to Mr. Kim about his discriminatory comments, his accounting practices, and his misrepresentations to investors. Mr. Kim retaliated. He sidelined Ms. Ko and assigned tasks historically under her purview to Bennat Berger, a white male with no experience in human resources. Mr. Kim explained this shift with blatantly anti-woman and anti-Asian stereotypes, telling Ms. Ko that she was not "charismatic enough" or able to "connect" with employees, stating that certain communications should happen "White man to White man," and mocking transgender people. This situation reached a tipping point when Mr. Kim publicly humiliated Ms. Ko during a meeting with the Company's overwhelmingly male executive team. And when Ms. Ko confronted Mr. Kim about his behavior, he harassed and demeaned Ms. Ko as a "good girl," saying, pejoratively, that she was not like him, because she comes from a "good family" and has "high integrity."

4.      On September 5, 2024, Ms. Ko submitted a formal complaint to Mr. Kim outlining the discrimination and retaliation she was experiencing and had observed. Just hours later, Mr. Kim contacted her, demanding that she withdraw her complaint and threatening not to meet with her unless she complied. Ms. Ko refused. Mr. Kim then doubled down, threatening to suspend Ms. Ko's employment if she did not retract her complaint. Ms. Ko again refused and hired a lawyer.

5.      On October 7, 2024, Ms. Ko's lawyer sent Swiftly's counsel, Jean Schmidt of Littler Mendelson P.C. ("Littler"), a detailed letter outlining Ms. Ko's claims against Swiftly and Mr. Kim. At Ms. Schmidt's instigation, Swiftly escalated its campaign of retaliation. On October 30, 2024—the night before a board meeting that Ms. Ko was scheduled to attend—Ms. Schmidt informed Ms. Ko's counsel that Swiftly would be involuntarily and indefinitely placing Ms. Ko on leave pending an investigation into her claims. Counsel for Ms. Ko protested the unlawful and retaliatory nature of the decision in a letter dated that day, but Ms. Schmidt refused to relent.

6.      Swiftly extended Ms. Ko's involuntary suspension three times over the following four months, despite Ms. Ko's protests and her diligent participation in Swiftly's putative independent investigation. Indeed, Ms. Ko's involuntary leave continued for over a month after Ms. Schmidt received the official report of that investigation—a report that identified Littler as the source of the unlawful idea of involuntarily placing Ms. Ko on indefinite leave.

7.      On February 17, 2025, Ms. Schmidt finally informed counsel for Ms. Ko that Swiftly wanted Ms. Ko to return to work the following Monday, February 24. But after Ms. Ko's counsel requested remedial measures to prevent further retaliation, Ms. Schmidt switched course, directing Ms. Ko to remain involuntarily suspended for an additional week, until March 3, 2025.

8.      On February 27, 2025, Ms. Ko filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") against Swiftly, Mr. Kim, Ms. Schmidt, and Littler.

9.      Three days later, on March 2, 2025—the evening before Ms. Ko's slated return— Ms. Schmidt informed Ms. Ko's counsel that Swiftly had eliminated Ms. Ko's position and that Ms. Ko would be terminated effective March 7, 2025. This action—taken just three days after Ms. Ko engaged in protected activity by filing an EEOC charge—constituted blatant retaliation.

10.     Swiftly and Mr. Kim's campaign of discrimination and retaliation, aided and abetted by Ms. Schmidt and Littler, violate the New York City Human Rights Law, the New York State Human Rights Law, and New York Labor Law § 740. Defendants' actions demonstrate an unlawful desire to silence Ms. Ko and cause long-term damage to her career. Ms. Ko thus seeks an order enjoining Swiftly's retaliatory termination and ordering her immediate reinstatement.

## PARTIES

11.     **PLAINTIFF JIIN KO** has been an employee at Swiftly since March 2023. She was hired as Swiftly's Chief People Officer and has served as its Chief Financial Officer and has managed the IT department since March 2023 and April 2023, respectively. Ms. Ko is domiciled in Manhattan, and she works for Swiftly from Manhattan. At all relevant times, Ms. Ko was an "employee" of Swiftly within the meaning of New York Labor Law § 740, New York City Admin. Code § 8-102, and New York Exec. Law § 292.

12.     **DEFENDANT SWIFTLY SYSTEMS, LLC** is a retail technology and media company. Swiftly's platform helps retailers gather customer data and generate advertising revenue. Swiftly is incorporated in Delaware and headquartered in Seattle. At all relevant times, Swiftly was Ms. Ko's "employer" within the meaning of New York Labor Law § 740, New York City Admin. Code § 8-102, New York Exec. Law § 292, and Tile VII of the Civil Rights Act of 1964.

13.     **DEFENDANT HENRY KIM** is Swiftly's Chief Executive Officer and Co-Founder. Kim resides and works in Nevada and/or California. At all relevant times, Mr. Kim was Ms. Ko's "supervisor" within the meaning of New York Labor Law § 740 and Tile VII of the Civil Rights Act of 1964.

14.     **DEFENDANT LITTLER MENDELSON P.C.** is Swiftly's legal counsel. Littler maintains an office in Manhattan, and a plurality of Littler's shareholders work from its Manhattan Office.

15.     **DEFENDANT JEAN SCHMIDT** is Swiftly's legal counsel at Littler. Schmidt is a citizen of New York and a resident of Manhattan.

## JURISDICTION AND VENUE

16.    The Court has subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Plaintiff's claims arising under New York State and New York City law under 28 U.S.C. § 1367(a).

17.    Plaintiff timely filed a charge with the United States Equal Employment Opportunity Commission on February 27, 2025, and is in the process of perfecting her right to sue.

18.    The Court has personal jurisdiction over Defendant Swiftly. Defendant Swiftly's wrongful acts or omissions were committed in New York State and/or caused injury to Plaintiff within New York State. Defendant Swiftly regularly does or solicits business, engages in a persistent course of conduct, and/or derives substantial revenue from goods used or services rendered in New York State.

19.    The Court has personal jurisdiction over Defendant Kim. Defendant Kim's wrongful acts or omissions were committed in New York State and/or caused injury to Plaintiff within New York State.

20.    The Court has personal jurisdiction over Defendant Littler. Defendant Littler's wrongful acts or omissions were committed in New York State and/or caused injury to Plaintiff within New York State. Defendant Littler regularly does or solicits business, engages in a persistent course of conduct, and/or derives substantial revenue from goods used or services rendered in New York State.

21.    The Court has personal jurisdiction over Defendant Schmidt, because Schmidt is a citizen of New York.

22.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f), because significant events giving rise to Ms. Ko's claims took place in the Southern

District of New York, and, because Ms. Ko was at all relevant times a resident in this district and experienced injury from Defendants' unlawful actions here.

<strong>STATEMENT OF FACTS</strong>

**A.  Ms. Ko's Educational and Professional Background**

23.     Ms. Ko holds a Bachelor of Science in policy and management from Carnegie Mellon University. She joined Swiftly in 2023 with nearly twenty years of experience in people management. She gained early experience in human resources and financial analysis at the YMCA and JP Morgan Chase, respectively. She then quickly advanced from a human resources specialist at Louis Vuitton Moet Hennessy, Kroll, and Pret A Manger, to Chief People Officer roles at Maison Kayser, Schuman Cheese, and Cook Unity.

24.     Across these organizations, Ms. Ko led and implemented policies related to employee relations, performance management, talent acquisition and retention, risk management, cost savings, benefits and rewards, compliance and mediation, and people analytics. She played key roles in the success of these global companies, transforming their organizational structures to align with their growing business needs and successfully coaching executives and managers to enhance their leadership skills, foster better performance among their teams, and reduce inefficiencies. And throughout her career, she consistently championed diversity and cultivated inclusive cultures of belonging and respect.

**B.  Ms. Ko's Strong Performance at Swiftly**

25.     Ms. Ko joined Swiftly in or around March 2023 as Chief People Officer, having been referred for the role by one of Swiftly's largest investors.

26.     Before joining Swiftly, Ms. Ko asked Mr. Kim about bonus eligibility, but he told her that he would not be able to consider a bonus plan until Swiftly was profitable. Mr. Kim would,

however, later give large bonus eligibility to male employees.

27.    Ms. Ko nonetheless worked hard for the company. She quickly took charge of the Company's human resources function, spearheading innovative engagement programs and executing strategic people initiatives that supported Swiftly's rapid growth and expansion. Ms. Ko implemented recruitment strategies to shift portions of Swiftly's workforce overseas, making talent acquisition more affordable for Swiftly. She also created and implemented processes and policies to create higher performing teams and introduced wellness programs and employee engagement surveys. Her efforts produced measurable improvements in employee engagement and wellness, recruitment, onboarding, and performance management systems.

28.    Mr. Kim immediately recognized Ms. Ko's abilities and praised her as the most reliable and competent leader with whom he had ever worked. Because Mr. Kim trusted Ms. Ko, he assigned her additional responsibilities: She was named Chief Financial Officer within a week of joining and was asked to manage the IT department just one month thereafter.

**C.  Ms. Ko Witnesses and Hears Discriminatory Statements by Mr. Kim**

29.    Ms. Ko's experience, efforts, and results should have garnered the respect and deference owed to a successful C-suite executive. Instead, Ms. Ko quickly found herself forced to fight against gendered stereotypes of women, Koreans, and parents and caregivers.

30.    In June of 2023, Mr. Kim sent Ms. Ko and another senior executive a video of a social media influencer explaining the federal Pregnant Workers Fairness Act. The Act requires covered employers to provide reasonable accommodations to qualified employees. He commented, "We need to move the company to Korea."



31.    In one sentence Mr. Kim encapsulated at least two bigoted tropes, both unlawful: (1) that pregnant workers do not deserve accommodation and (2) that Korean workers should (or at least would) labor without complaint.

32.    Mr. Kim repeated these stereotyped views about Koreans and employees who have children throughout Ms. Ko's tenure at the Company. He told Ms. Ko that "[t]he Koreans are relentless" and praised the "Korean mentality." He suggested that the Company move to Korea to take advantage of this "mentality." And he openly disparaged employees and candidates with children, instructing Ms. Ko that he "no longer want[ed] to bring on any executives with young children."



33.     Ms. Ko opposed Mr. Kim's discriminatory comments. For example, when Mr. Kim

shared his hostile views about the Pregnant Workers Fairness Act, Ms. Ko told him that he should

not make these sorts of comments. When he expressed his opposition to hiring employees with

children, Ms. Ko advised him that the Company should be open to hiring anyone qualified to do

the job. And when he made discriminatory comments about Korean workers, Ms. Ko told him that

he should not assume that all people of Korean national origin are the same.

34.     Mr. Kim's biases were not idle talk. Mr. Kim had acted on his view of Koreans by

assigning Ms. Ko, a Korean-American, two new areas of responsibility with no corresponding

increase in compensation. Mr. Kim first asked Ms. Ko to serve as Chief Financial Officer. He

claimed that the Company would hire a permanent executive in due time, but as the search wore

on, Mr. Kim increasingly complained about the expense of hiring a qualified candidate, and continued to assign Ms. Ko finance tasks. Mr. Kim next tasked Ms. Ko with managing the Company's Information Technology function when its Head of Engineering left on April 29, 2023. Ms. Ko tackled these responsibilities head-on, saving the firm hundreds of thousands of dollars, yet received no increase in compensation.

35.     Ms. Ko's experience in this regard stands in contrast to that of a male colleague, who was given additional shares when he temporarily oversaw a separate function. Ms. Ko, however, continued to wear three hats—Chief People Officer, Chief Financial Officer, and manager of the IT function—without a corresponding increase in pay. Mr. Kim apparently believed that Ms. Ko would not complain about these and other inequities. He was wrong.

### D.  Ms. Ko Learns of Swiftly and Mr. Kim's Unlawful Expense Practices

36.     In April of 2023, Mr. Kim assigned Ms. Ko to oversee the Company's accounting function. Her responsibilities were to include reviewing and approving expenses.

37.     Mr. Kim made clear his exacting expectations: He directed Ms. Ko to scrutinize receipts and target employees who left tips as small as $1.00 at chain restaurants like Starbucks or Panera. It was their job, he said, to be careful with the Company's money.

*i. Mr. Kim Spends Lavishly on Himself*

38.     Mr. Kim did not, however, apply this admonition to himself. In June of 2023, Mr. Kim submitted his own expenses to Ms. Ko for the first time. He provided no receipts.

39.     Ms. Ko soon discovered that Mr. Kim had never provided receipts for the majority of his expenses. Instead, he would either submit his personal credit card statements or an Excel sheet with a list of his expenses and demand payment. She learned that although Swiftly's accounting team members had long been frustrated with Mr. Kim for not submitting receipts, they

had been afraid to say anything for fear of retaliation.

40.     Ms. Ko was concerned. Absent receipts and explanations, she could not determine whether Mr. Kim's expenses were real or invented, or whether they were business expenses or personal expenses, the Company's payment of which would have been compensation to Mr. Kim and taxable accordingly: The failure to properly record the expenses and pay any tax owed on the personal ones was a potential legal violation. Likewise, she was concerned that the misuse of Company funds for personal expenses could constitute fraud or a breach of fiduciary duties owed to investors—the very investors who had introduced her to the Company.

*ii. Ms. Ko Rejects Mr. Kim's Self-Indulgent Expenses*

41.     On June 9, 2023, Ms. Ko informed Mr. Kim that she would not approve his expenses without receipts.

42.     Later, Ms. Ko learned that Mr. Kim had been submitting his expenses in an Excel spreadsheet and writing himself checks. These included significant checks to "cash."

43.     The more Ms. Ko dug into Mr. Kim's expenses, the greater the concerns she uncovered.

44.     In October 2023, Mr. Kim submitted $6,000 in expenses related to his move to Las Vegas. Ms. Ko sought clarification around the reimbursement from Mr. Kim. She questioned why the Company was covering his moving expenses at all. Mr. Kim responded that it was because he stored the Company's equipment and furniture in his apartment. But Ms. Ko later learned that this explanation, too, was false: The Company's equipment and furniture were stored in Washington State, where the office had previously been located, meaning the Company had essentially paid for Mr. Kim's personal move to Las Vegas.

45.     On November 8, 2023, Ms. Ko raised concerns about the Company's excessive

spending, including the cost of the Company's leased apartment in Washington, which Mr. Kim and Swiftly co-founder Sean Turner listed as their address for payroll purposes. The apartment in Seattle had cost the company about $32,000 in 2023. (The Company finally terminated the lease on 12/31/2024 at Ms. Ko's urging.)

46.     In November 2023, Ms. Ko once again asked Mr. Kim to provide receipts with his expense submissions. Mr. Kim attempted to downplay the issue, telling Ms. Ko that "it wasn't a big deal" and that he could retrieve the receipts from his credit card company if they were ever audited—but that he doubted that would ever happen given Swiftly's small size. Ms. Ko suggested that Mr. Kim use a Company credit card, but Mr. Kim refused.

*iii. Ms. Ko Finds More Questionable Expenses*

47.     Ms. Ko's suspicions grew, and, in December 2023, she began reviewing Mr. Kim's previous expense submissions. She discovered that Mr. Kim had demanded that the Company reimburse him $100,000 for a United Global Services Membership. Ms. Ko again raised concerns, questioning why the Company was covering such a costly and seemingly personal expense. Mr. Kim responded that the membership would essentially work as a credit towards travel expenses for the following twelve months and that he would spend more than $100,000 on travel annually. This explanation, however, was plainly false: Mr. Kim's travel expenses for 2023 were well below $100,000, and there was no reason to believe that 2024 would be any different. Ms. Ko raised this issue again, and Mr. Kim assured her he would travel more in 2024. Yet there was little reason to believe this explanation either: Ms. Ko had learned that Mr. Kim had foisted the same membership cost onto the Company in 2022 for his 2023 travel, meaning that $300,000 of Swiftly's money had been used to pay for Mr. Kim's personal United Global Services Membership.

48.     On February 26, 2024, Ms. Ko again told Mr. Kim that he needed to submit receipts

for all expenses. Mr. Kim still did not comply.

*iv. Mr. Kim Charges Lavish Superbowl Expenses to the Company*

49.     In March 2024, Mr. Kim submitted numerous expenses, which again appeared increasingly personal and lacked any receipts. He included reimbursement for luxurious hotel accommodations and expensive meals and drinks purchased while attending the 2024 Super Bowl with Bennat Berger, a young male investor in the Company. Ms. Ko again raised concerns to Mr. Kim, and Mr. Kim became increasingly frustrated with Ms. Ko, but Ms. Ko maintained that she could not approve these expenses without Board approval.

*v. Mr. Kim Recruits Mr. Berger to Advocate for His Improper Expenses*

50.     Mr. Berger now joined Mr. Kim in badgering Ms. Ko to approve Mr. Kim's expenses. On March 13, 2024, Mr. Berger emailed Ms. Ko, instructing her to approve Mr. Kim's expenses. He then called her and yelled at her, saying that she was being difficult and that she should not waste Mr. Kim's time with expense issues. Ms. Ko responded that she could not approve the expenses because they were charged to Mr. Kim's personal card, and the company had no way to obtain the necessary receipts. Mr. Berger, in turn, blamed Ms. Ko for not ensuring that Mr. Kim had a company credit card. Ms. Ko again explained that Mr. Kim had refused to use a company credit card. Nevertheless, Mr. Berger ordered Ms. Ko to immediately arrange for Mr. Kim to receive a Company credit card. Ms. Ko complied and instructed the accounting team to do so.

51.     On March 21, 2024, Mr. Kim received a company credit card to be used for all business-related expenses. The card was activated on the same day.

52.     On April 10, 2024, Ms. Ko followed up with Mr. Kim and asked him if he was using the card for all business-related expenses. Mr. Kim, growing increasingly agitated, said he

would "get there slowly" and would use the card when he was ready.

53.    In June 2024, Mr. Berger transitioned from investor to Swiftly employee and lost authority to personally approve Mr. Kim's expenses. Ms. Ko thereafter had to seek expense approval from board member Brian Lee—a lifelong friend of Mr. Kim's.

54.    Also during the summer of 2024, Ms. Ko learned that Mr. Kim was seeking reimbursement for more lavish, seemingly personal expenses: He had spent thousands of dollars visiting Korean room salons a.k.a "hostess bars," where primarily female servers cater to men seeking female attention.

55.    As far as Ms. Ko is aware, Mr. Kim has not provided receipts or used a company card to date.

56.    Mr. Kim's dismissiveness towards Ms. Ko's concerns about his expenses was infused with discrimination against Ms. Ko based on her race, national origin, and gender. Swiftly's former CFO, who was also female, had apparently raised similar concerns and then been terminated. As to Ms. Ko, when she did not submit to Mr. Kim's unlawful directives, he sought to override her authority by referring her to male investors and board members. Mr. Kim did not behave with similar dismissiveness towards Ms. Ko's male colleagues.

**E.  Ms. Ko Learns of Swiftly's Unlawful Accounting Practices**

57.    Mr. Kim's use of the Company's money for personal expenses was not the only accounting issue around which Ms. Ko sought to sound the alarm.

58.    In December 2023, the Company held a meeting with a senior manager at Deloitte to discuss Swiftly's revenue. Ms. Ko was unable to attend the meeting, but the Company's Senior Accountant, Financial Controller Kristen Oleske, Chief Operating Officer Dan Khan, and Senior Vice President of Strategy and Operations Ankit Jain attended the meeting.

59.     On March 1, 2024, Ms. Ko set up a meeting with the Company's Director of Finance and Senior Accountant to review the Company's financial performance. Ms. Ko learned during this meeting that Mr. Kim had been improperly including Swiftly's offer listing as revenue in its revenue reports.

60.     "Offer listing" is not revenue. Rather, it reflects money that Swiftly passes from its clients to its clients' customers, for example to fund a rewards program.

61.     Ms. Ko spoke with Ms. Oleske and learned that although the Company's accounting team had never included offer listing as revenue in its projections or reports, the accounting team did not control the financial documents created by Mr. Kim—documents which likely did include offer listing as revenue.

62.     A month later, Ms. Ko traveled to San Francisco for an offsite meeting to prepare for an upcoming board meeting scheduled for April 19. Ms. Ko discovered that the board deck prepared by Mr. Kim and Mr. Jain included offer listing as revenue in the revenue reports to be presented to the board.

63.     This inclusion appears to have been designed to placate the Company's investors. During the San Francisco offsite in April 2024, Mr. Kim instructed Ms. Ko to calm ongoing revenue concerns of some of the Company's investors. Mr. Kim specifically asked Ms. Ko to join his in-person meeting with one investor and to share optimistic views of how the Company expected to perform in Q3. Likewise, on March 5, 2024, Mr. Kim directed Ms. Ko to ignore emails from Vivek Garipalli, Founder of Metro Health, regarding the Company's financials.

64.     On May 28, 2024, Mr. Kim sent an email to Mr. Garipalli to provide updates regarding the Company's performance, including its revenue. Mr. Kim copied Ms. Ko on the email, and Ms. Ko noticed that Mr. Kim had again included offer listing as revenue in Swiftly's revenue

report. Ms. Ko also realized that Mr. Kim was doing this to offset the negative revenue impact of losing one of Swiftly's major clients during the fourth quarter of 2023.

**F. Ms. Ko Opposes Swiftly's Unlawful Revenue Reporting, and Mr. Kim Responds by Calling Swiftly's Auditors "Motherfuckers"**

65.    On May 13, 2024, Mr. Kim asked Ms. Ko to request written confirmation from Deloitte that there were no issues related to the Company's 2023 audit. The audit had not been finalized since there were still outstanding items that needed to be reviewed. Ms. Ko thus informed Mr. Kim that she did not think it was appropriate to request such confirmation. Mr. Kim exploded. He screamed at Ms. Ko and said, "I will not let Deloitte motherfuckers stop me from getting funds from Advantage Solutions." Mr. Kim then moved to speak with Deloitte directly.

66.    The Company thus apparently continued to use two numbers: the correct ones generated by Ms. Ko and her team on the one hand, and the inaccurate ones generated by Mr. Kim for the Company's investors and employees. Ms. Ko learned of this deceit directly from the Company's investors. In June of 2024, Ms. Ko sent a profit and loss report for the Company's alcohol business to Chief Commercial and Marketing Officer Alasdair James and Mr. Berger. This report included an accurate report of the revenue without including offer listing as revenue. Mr. Berger responded negatively and indicated that the report was different from the one he was shown upon joining the Company.

**G. Mr. Kim Instructs Ms. Ko Not to Share Swiftly's True Revenue with Anyone**

67.    Mr. Berger raised this disparity on July 10, 2024, during an in-person meeting including Mr. Kim, Mr. Berger, and Ms. Ko in New York. But rather than correct the record with the Company's investors, Mr. Berger and Mr. Kim instructed Ms. Ko to bury the disparity.

68.    Mr. Berger instructed Ms. Ko, "Don't even create and share those reports with anyone anymore." Ms. Ko questioned this instruction, but Mr. Kim piled on, stating, "You don't

want to tick off our investors."

69.     Ms. Ko again protested, advising Mr. Kim and Mr. Berger that Deloitte had instructed the Company not to include offer listing as revenue in its revenue reports. Mr. Kim, however, simply smirked, and told Ms. Ko not to worry about it.

70.     As with Swiftly and Mr. Kim's expense practices, Mr. Kim would not have brushed off Ms. Ko's concerns about Swiftly's accounting practices if she were a man.

**H.  Swiftly Sidelines Ms. Ko**

71.     Mr. Kim did not take kindly to Ms. Ko's outspokenness. He thus engaged in a campaign to marginalize and ultimately replace her.

72.     The first step was to assign Mr. Berger, who had invested in the Company during its seed round, important responsibilities and authority that should have belonged to Ms. Ko.

73.     In June 2024, Mr. Kim hired Mr. Berger as an employee over Ms. Ko's recommendation, demanded that she begin the onboarding process immediately, and instructed a generous pay package. This significant pay package spoke to Mr. Kim's view of the value of male executives: Just a few months earlier, Mr. Kim had made a similar offer to Mr. James, leaving Ms. Ko as the only executive without bonus eligibility. Ms. Ko raised this inequity with Mr. Kim, but he downplayed the concern. He said that Ms. Ko should not worry, because he never intended to pay the bonuses. He also verbally promised to give her bonus eligibility, but nothing was put in writing, and Ms. Ko never received a bonus.

74.     After Mr. Berger's hiring, Mr. Kim assigned him tasks related to Ms. Ko's core job responsibilities, such as employee retention. When Ms. Ko questioned Mr. Kim's decision to involve Mr. Berger in one retention matter, Mr. Kim reasoned that Mr. Berger could "connect" with the departing employee better, because the two could have a "White male to White male"

conversation and/or because both were Jewish. Ms. Ko also received concerns about Mr. Berger's involvement in the company from other female employees, who told her that Mr. Berger was making them feel uncomfortable. She raised these concerns, too, with Mr. Kim, but Mr. Kim was dismissive and stated that he needed Mr. Berger to back him up.

75.    Mr. Kim next excluded Ms. Ko from the decision to terminate Swiftly's Chief Product & Technology Officer, Yang Tang. On June 26, 2024, Mr. Kim informed Ms. Ko that the Company had decided to terminate Mr. Tang effective immediately. Mr. Kim told Ms. Ko that he had received various direct complaints about Mr. Tang's poor leadership skills and terrible decisions. Ms. Ko was concerned that Mr. Kim's informal process of soliciting feedback reflected no standardized procedure and might be vulnerable to bias. This concern was particularly acute because Mr. Kim had previously made discriminatory comments related to Mr. Tang's family responsibilities—comments that echoed his prior comments about the Pregnant Workers Fairness Act. Nonetheless, Mr. Kim persisted in his directive, and Mr. Tang was terminated, causing serious concerns among Swiftly's investors.

76.    On July 10, 2024, Ms. Ko discovered that Mr. Kim and Mr. Berger had scheduled a meeting with Daversa, a recruiting agency set to handle the search for a new Chief Operating Officer and Chief Financial Officer. Overseeing such a search would typically fall squarely under Ms. Ko's core area of responsibilities, yet, even after she spent an entire day alongside Mr. Kim and Mr. Berger, Mr. Kim still failed to inform Ms. Ko of the meeting with the recruiting agency. Instead, Mr. Kim included Mr. Berger.

77.    Ms. Ko confronted Mr. Kim about this exclusion. Mr. Kim did not hide his reasons in response: He said that he wanted to ensure that the agency would consider only candidates without young children—something he believed he could communicate more clearly than Ms. Ko.

I.    **Ms. Ko Complains of Discrimination on the Basis of Race and Gender and Mr. Kim Explodes Publicly, Calling her a "Good Girl," Threatening to Breach His Fiduciary Duties, and Landing Ms. Ko in the Hospital**

78.    Mr. Kim could now barely hide resentments towards Ms. Ko. On July 17, 2024, during a Revenue War Room meeting, Mr. Kim publicly humiliated Ms. Ko in front of the Company's predominantly male executive team. When Ms. Ko provided explanations for recent resignations in the Data Engineering team based on exit interviews, Mr. Kim immediately dismissed her, stating, "That's not true, you have no idea why they left; they left because of Yang." Mr. Kim used this opportunity to undercut Ms. Ko's expertise and continued to weaponize his communications with Mr. Berger to diminish Ms. Ko's role and leadership in front of her peers.

79.    After that meeting concluded, in the early hours of July 18, 2024, Ms. Ko spoke with Mr. Kim and told him how his actions had upset and humiliated her.

80.    That conversation ended around 2:30 a.m. EST on July 18. Shortly thereafter, Ms. Ko began experiencing severe health symptoms. She rushed to the ER and was not released until later that evening.

81.    On July 19, 2024, Ms. Ko again confronted Mr. Kim about his behavior. She cited his actions the preceding days during the Company's Revenue War Room meeting. She explained that Mr. Kim had used Mr. Berger, a white man, to undermine her contributions and feedback. She reiterated that as the Chief People Officer, it was imperative that she be included in discussions concerning employee relations, retention, and acquisition—not sidelined in favor of Mr. Berger.

82.    Mr. Kim exploded. He launched into a tirade, harassing Ms. Ko as a "good girl" who had grown up in a "nice family" with "high integrity," and insinuating that these qualities were weaknesses. He continued, "I don't give a fuck about what other people think of me. I don't care how I am perceived. I am not even scared of our investors. If any of our investors want to get

rid of me, I will make sure they lose all of their investment. I will make sure they all lose everything."

83.    Ms. Ko felt threatened by these statements, recognizing them as a warning against speaking to the Company's investors about his potentially unlawful financial practices. His language reflected how he truly saw Ms. Ko: not as an executive, but as a weak Korean girl whom he could control.

### J.  Swiftly Retaliates Against Ms. Ko for Her Complaints by Excluding Her from Decisions About Personnel, Finance, and Operations

84.    Mr. Kim further reduced his contact with Ms. Ko as a result of her July 18, 2024, complaints, excluding her from staffing decisions, revenue meetings, operations, employee retention, and hiring. This sidelining included preventing Ms. Ko from a meeting with a candidate for the Vice President of Engineering role—a decision that Mr. Turner dismissed by stating that Ms. Ko was not smart enough to meet with the candidate.

85.    Despite this campaign of retaliation, Ms. Ko sought to persevere and to confront the Company's increasingly male leadership. On August 18, 2024, at the end of a meeting to discuss pay increases and bonuses, Ms. Ko stated, "Though we don't have to solve this issue or have a long discussion today, I would like to bring it to your attention that women are paid less than men at Swiftly."

86.    Mr. Kim dismissed Ms. Ko's pay equity concern out of hand, suggesting that Ms. Ko include Angee Walls, a highly paid third-party contractor, in her considerations. He cracked, "Last time I checked, she is still a woman." Mr. Kim then laughed and suggested that the Company "should ask some male employees to identify as women" to "solve the problem" and skew the numbers.

87.    In September, Ms. Ko learned that Mr. Turner had told a female employee that Ms. Ko was responsible for a decision to prorate her pay increase due to her maternity leave. Ms. Ko confronted Mr. Turner about this comment. Mr. Turner admitted to telling various individuals that the compensation decision was Ms. Ko's decision—even though it was his—because he did not want his team to be upset.

88.    Mr. Berger also took up the retaliation. In September, Mr. Kim directed an employee who was concerned about her compensation to speak with Mr. Berger about it—and Mr. Berger, in turn, sought to use this complaint as a pretext to build a case to terminate Ms. Ko. He nonetheless came up with insufficient evidence to justify her termination.

### K.    Ms. Ko Raises a Formal Discrimination and Whistleblower Retaliation Complaints; Swiftly Retaliates By Suspending Her

89.    On September 5, 2024, Ms. Ko made a written complaint to Mr. Kim outlining her claims of discrimination based on gender and race, as well as retaliation for raising concerns related to unlawful financial practices. Mr. Kim contacted her mere hours later and demanded that she withdraw it. The next day, he threatened to suspend her employment if she did not withdraw her complaint. Ms. Ko refused to withdraw her complaint.

90.    On September 11, 2024, Ms. Ko's lawyer informed Mr. Kim and Swiftly that Ms. Ko was now represented by counsel in her claims. Swiftly executives responded by further limiting their contact with Ms. Ko.

91.    On October 7, Ms. Ko's counsel sent a letter to counsel for Swiftly and Mr. Kim detailing Ms. Ko's claims of financial fraud, breach of fiduciary duty, unlawful discrimination, and unlawful retaliation.

92.    After the October 7 letter, Ms. Schmidt suggested to Mr. Kim that Swiftly place Ms. Ko on leave because of her complaints. He apparently agreed.

93.     On October 29, Ms. Schmidt informed Ms. Ko's counsel that Swiftly intended to place Ms. Ko on involuntary paid leave pending an internal investigation into her claims.

94.     Ms. Ko's counsel wrote to Ms. Schmidt the next day that that this involuntary suspension was retaliatory and would violate, among other laws, the New York City Human Rights Law and New York Labor Law Section 740.

95.     In the evening on October 30, Ms. Schmidt confirmed in a letter to Ms. Ko's counsel that Ms. Ko would be placed on paid leave effective that day—despite counsel's warning that such a course was unlawful. Ms. Schmidt stated that she anticipated that the investigation would take one month. She instructed Ms. Ko not to do any work or conduct any business on behalf of Swiftly. She also instructed Ms. Ko to refrain from having any contact with any employee of Swiftly—thus preventing Ms. Ko from defending her reputation.

Please advise Ms. Ko client that effective immediately she is on a paid leave which will continue until the conclusion of the investigation. We anticipate that this will take a least a month.

Please also advise Ms. Ko that while she is on leave she is not to do any work or conduct any business on behalf of Swiftly, she is not to have any contact with any employee of Swiftly, and she is not to participate in any Swiftly activity, including any meetings or calls, either in person or virtually.

Finally, please let me know if Ms. Ko is willing to be interviewed by the investigator.

Sincerely,

*/s/ Jean L. Schmidt*
Jean L. Schmidt

96.     Swiftly's board was scheduled to meet on October 31, and Ms. Ko had originally been invited to attend that meeting. In fact, in reviewing the presentation for the upcoming board meeting, Ms. Ko had asked VP Jain where he had gotten the revenue reported for Swiftly's alcohol business, and he informed her that the number had come from Mr. Kim—again causing Ms. Ko to worry that Mr. Kim was inaccurately reporting revenue to board members. On the evening of October 30, Mr. Kim removed Ms. Ko from the invitation to that board meeting.

97.     On October 31, Mr. Kim sent an email to employees at Swiftly informing them that Ms. Ko would be on leave for one month. He did not indicate that the leave was involuntary.

**L.  Swiftly Directs Ms. Ko to Participate in a Lengthy Investigation While it Continues to Unlawfully Suspend Her**

98.     Swiftly and Ms. Schmidt next directed Ms. Ko to repeat her complaints to Gayle Wasserman, a putatively independent investigator retained by Swiftly and Ms. Schmidt to investigate Ms. Ko's claims. Ms. Ko complied and met with Ms. Wasserman on November 12, 18, 20, and 22, totaling nearly eight hours of interviews. Ms. Ko also provided a large volume of documents.

99.     Throughout this process, Mr. Kim was never suspended.

100.    On December 2, Mr. Kim informed Swiftly that Ms. Ko's leave would be extended until the beginning of 2025. Again, he did not indicate the unlawful retaliatory motive for Ms. Ko's leave.

101.    On January 6, 2025, Ms. Schmidt informed Ms. Ko's counsel that Swiftly would be extending Ms. Ko's suspension by another month because the investigation was not yet complete.

102.    Ms. Wasserman's investigation was apparently completed on January 23, 2025. Nonetheless, Swiftly did not so inform Ms. Ko until February 2, 2025, and still refused to reinstate her despite her repeated requests.

103.    Because Swiftly barred Ms. Ko from communicating with any Swiftly employees, for four months, she could not so much as confirm that she was not under investigation for misconduct, not injured, or capable of doing her job. Although Ms. Ko received repeated outreach from her colleagues during her suspension, she could not respond. This lack of responsiveness caused damage to Ms. Ko's reputation. Ms. Ko was previously known as extremely responsive

and receptive to outreach. And without an explanation for Ms. Ko's involuntary leave, many at Swiftly assumed that she was on leave because she engaged in some sort of wrongdoing.

### M. Swiftly Orders Ms. Ko Back to Work, but then Terminates Her After She Files EEOC Charges

104.    Finally, on February 17, 2025, Ms. Schmidt informed Ms. Ko's counsel that she was to return to work on February 24, 2025.

105.    In response, Ms. Ko inquired about her responsibilities, and her counsel asked Ms. Schmidt about the protections from retaliation that Swiftly intended to implement. In retaliation, on February 22, 2025, Swiftly extended Ms. Ko's suspension by another week, until March 3, 2025.

106.    On February 27, 2025, Ms. Ko filed discrimination charges with the EEOC against Swiftly, Mr. Kim, Ms. Schmidt, and Littler. These charges detailed the same discrimination and retaliation described herein. Counsel for Ms. Ko informed Ms. Schmidt of these charges immediately after they were filed and reiterated Ms. Ko's intent to return to work on March 3.

---

Jean-

Ms. Ko has just filed a charge with the EEOC against Swiftly, Mr. Kim, Littler, and you, alleging unlawful discrimination on the basis of race, national origin, and gender, as well as unlawful retaliation in response to protected activity. As I am sure you know, all of the foregoing have obligations not to retaliate further. We thus continue to anticipate Ms. Ko's return to work on Monday.

In the meantime, if you believe that further settlement discussions would be helpful, please let us know.

Best,

Russell

---

107.    That same day, Ms. Schmidt emailed counsel for Ms. Ko stating that Swiftly would agree to certain remedial measures. She requested that counsel for Ms. Ko provide suggested language for a company-wide communication announcing Ms. Ko's return; agreed to circulate EEOC guidance on retaliation to Swiftly employees who were aware of Ms. Ko's complaints; and

designated board member Tad Dickson as Ms. Ko's point person for concerns of retaliation. By all indications, Swiftly was preparing for Ms. Ko's return the following Monday.

108.    On Friday, February 28, counsel for Ms. Ko informed Ms. Schmidt that Ms. Ko was prepared to return to work on Monday and offered the requested language announcing her return. Ms. Schmidt did not respond to this email.

109.    That Sunday evening, on March 2, 2025—just three days after Ms. Ko's most recent act of protected activity—Ms. Schmidt informed counsel for Ms. Ko that her role had been eliminated, that she would be terminated on March 7, 2025, and that she should not return to work the following day.

> Russell,
>
> Swiftly has decided to eliminate the position of Chief People Officer due to financial and operational considerations, including that the Company needs to reduce costs and has determined that it does not need a CPO.  Ms. Ko will be receiving an email advising her of the elimination of her position and that her employment with Swiftly will end effective March 7, 2025. Ms. Ko will remain on paid leave through March 7, 2025.
>
> Regards,
> Jean

110.    The actions of Swiftly, Mr. Kim, Ms. Schmidt, and Littler, in particular this most recent egregious act of retaliation, suggest that Swiftly never intended to reinstate Ms. Ko and always intended to eject her from the Company because she raised good faith complaints.

### **FIRST CLAIM FOR RELIEF**
### **Retaliation in Violation of New York Labor Law § 740(2)**
### **(Against All Defendants)**

111.    Plaintiff realleges by reference all facts alleged in the previous paragraphs as though fully set forth herein.

112.    Defendants' retaliatory actions, based on Plaintiff's expression of good faith concerns that their activities, policies, and practices were unlawful, violate Section 740 of the New York Labor Law.

113.    Plaintiff reasonably believed that the conduct described above was a violation of a law, rule, or regulation.

114.    Plaintiff contemporaneously objected to conduct that she reasonably believed was a violation of a law, rule, or regulation.

115.    Plaintiff disclosed to her supervisor and his representatives conduct that she reasonably believed was a violation of a law, rule, or regulation.

116.    Defendants engaged in prohibited retaliatory action against Plaintiff because she engaged in protected conduct.

117.    Plaintiff suffered harm by reason of Defendants' unlawful conduct and has suffered losses and damages in an amount to be proven.

118.    Plaintiff seeks all relief allowable by law.

### SECOND CLAIM FOR RELIEF
**Sex Discrimination in Violation of the New York City Human Rights Law**
**N.Y.C. Admin. Code § 8-107(1)(a)**
**(Against Defendants Swiftly and Kim)**

119.    Plaintiff realleges by reference all facts alleged in the previous paragraphs as though fully set forth herein.

120.    Defendants Swiftly and Kim subjected Plaintiff to sex discrimination in the terms, conditions, and privileges of employment in violation of the New York City Human Rights Law.

121.    Defendants Swiftly and Kim have treated Plaintiff less well than other employees at least in part because of her gender.

122.    Based at least in part on her gender, Plaintiff was treated differently from and worse than others in a way that was more than trivial, insubstantial, or petty.

123.    Defendants' actions amount to willful or wanton negligence, and/or recklessness, and/or exhibit a conscious disregard for the rights of Plaintiff, and/or constitute conduct so reckless

as to amount to such disregard.

124.    As a result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

125.    Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of hardships between Plaintiff and Defendants, entitle Plaintiff to an equitable remedy such as a temporary restraining order reinstating her, which would not disserve the public.

126.    As a result of Defendants' unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including injunctive relief, back pay, front pay (if injunctive relief is denied), compensatory damages, punitive damages, attorneys' fees and costs, and/or other appropriate relief.

### THIRD CLAIM FOR RELIEF
**Race Discrimination in Violation of the New York City Human Rights Law**
**N.Y.C. Admin. Code § 8-107(1)(a)**
**(Against Defendants Swiftly and Kim)**

127.    Plaintiff realleges by reference all facts alleged in the previous paragraphs as though fully set forth herein.

128.    Defendants Swiftly and Kim subjected Plaintiff to race discrimination in the terms, conditions, and privileges of employment in violation of the New York City Human Rights Law.

129.    Defendants Swiftly and Kim have treated Plaintiff less well than other employees at least in part because of her race.

130.    Based at least in part on her race, Plaintiff was treated differently from and worse than others in a way that was more than trivial, insubstantial, or petty.

27

131.    Defendants' actions amount to willful or wanton negligence, and/or recklessness, and/or exhibit a conscious disregard for the rights of Plaintiff, and/or constitute conduct so reckless as to amount to such disregard.

132.    As a result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

133.    Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of hardships between Plaintiff and Defendants, entitle Plaintiff to an equitable remedy such as a temporary restraining order reinstating her, which would not disserve the public.

134.    As a result of Defendants' unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including injunctive relief, back pay, front pay (if injunctive relief is denied), compensatory damages, punitive damages, attorneys' fees and costs, and/or other appropriate relief.

### FOURTH CLAIM FOR RELIEF
**National Origin Discrimination in Violation of the New York City Human Rights Law**
**N.Y.C. Admin. Code § 8-107(1)(a)**
**(Against Defendants Swiftly and Kim)**

135.    Plaintiff realleges by reference all facts alleged in the previous paragraphs as though fully set forth herein.

136.    Defendants Swiftly and Kim subjected Plaintiff to national origin discrimination in the terms, conditions, and privileges of employment in violation of the New York City Human Rights Law.

137.    Defendants Swiftly and Kim have treated Plaintiff less well than other employees

at least in part because of her national origin.

138.    Based at least in part on her national origin, Plaintiff was treated differently from and worse than others in a way that was more than trivial, insubstantial, or petty.

139.    Defendants' actions amount to willful or wanton negligence, and/or recklessness, and/or exhibit a conscious disregard for the rights of Plaintiff, and/or constitute conduct so reckless as to amount to such disregard.

140.    As a result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

141.    Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of hardships between Plaintiff and Defendants, entitle Plaintiff to an equitable remedy such as a temporary restraining order reinstating her, which would not disserve the public.

142.    As a result of Defendants' unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including injunctive relief, back pay, front pay (if injunctive relief is denied), compensatory damages, punitive damages, attorneys' fees and costs, and/or other appropriate relief.

## FIFTH CLAIM FOR RELIEF
### Retaliation in Violation of the New York City Human Rights Law
### N.Y.C. Admin. Code § 8-107(7)
### (Against Defendants Swiftly and Kim)

143.    Plaintiff realleges by reference all facts alleged in the previous paragraphs as though fully set forth herein.

144.    Plaintiff engaged in protected activity and Defendants Swiftly and Kim were aware

of Plaintiff's protected activity.

145.    Among other things, Plaintiff opposed the unlawful treatment to which she and other employees at Swiftly were being subjected by (a) complaining to Mr. Kim and other employees and agents of Swiftly; (b) threatening to bring a lawsuit against Defendants Kim and Swiftly alleging sex discrimination, race discrimination, national origin discrimination, and retaliation; and (c) filing discrimination charges with the EEOC.

146.    The practices opposed by Plaintiff constitute colorable violations of the New York City Human Rights Law.

147.    Plaintiff suffered actions that would be reasonably likely to deter a person from engaging in protected activity.

148.    Among other things, Defendants Swiftly and Kim (a) sidelined Plaintiff from her primary job duties; (b) threatened to suspend Plaintiff; (c) in fact suspended Plaintiff; and (d) ultimately terminated Plaintiff.

149.    There was a causal connection between Plaintiff's protected activities and Defendants Swiftly and Kim's actions.

150.    Defendants Swiftly and Kim subjected Plaintiff to such actions because of and in retaliation for Plaintiff's protected activities.

151.    Defendants Swiftly and Kim's actions amount to willful or wanton negligence, and/or recklessness, and/or exhibit a conscious disregard for the rights of Plaintiff, and/or constitute conduct so reckless as to amount to such disregard.

152.    As a result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress,

mental anguish, and other economic and non-economic damages.

153.    Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of hardships between Plaintiff and Defendants, entitle Plaintiff to an equitable remedy such as a temporary restraining order reinstating her, which would not disserve the public.

154.    As a result of Defendants' unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including injunctive relief, back pay, front pay (if injunctive relief is denied), compensatory damages, punitive damages, attorneys' fees and costs, and/or other appropriate relief.

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting in Violation of the New York City Human Rights Law
### N.Y.C. Admin. Code § 8-107(6)
### (Against Defendants Littler and Schmidt)

155.    Plaintiff realleges by reference all facts alleged in the previous paragraphs as though fully set forth herein.

156.    As set forth above, Defendants Swiftly and Kim unlawfully retaliated against Plaintiff when, among other things, they placed her on leave and then terminated her.

157.    Defendants Littler and Schmidt actually participated in this unlawful retaliation against Plaintiff when (a) Ms. Schmidt advised Swiftly and Mr. Kim that they could place Ms. Ko on leave because she complained; (b) informed Plaintiff that she would be placed on involuntary leave and instructed her to do no work for Swiftly nor contact any Swiftly employees pending an investigation; and (c) delivered Ms. Ko's termination notice three days after Ms. Ko filed EEOC charges against all Defendants.

158.    Defendants Littler and Schmidt persisted in this course of conduct even after Mr. Kornblith informed Ms. Schmidt that it violated the NYCHRL.

159.     By reason of the foregoing conduct, Littler and Ms. Schmidt aided and abetted Defendants Swiftly and Kim in their unlawful retaliation against Plaintiff, in violation of the NYCHRL.

160.     The aforementioned aiding and abetting by Littler and Ms. Schmidt was intentional.

161.     As a result of the unlawful conduct of Littler and Ms. Schmidt, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

162.     Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of hardships between Plaintiff and Defendants, entitle Plaintiff to an equitable remedy such as a temporary restraining order reinstating her, which would not disserve the public.

### SEVENTH CLAIM FOR RELIEF
**Sex Discrimination in Violation of the New York State Human Rights Law**
**N.Y. Exec. Law § 296(1)(a)**
**(Against Defendants Swiftly and Kim)**

163.     Plaintiff realleges by reference all facts alleged in the previous paragraphs as though fully set forth herein.

164.     Defendants Swiftly and Kim subjected Plaintiff to sex discrimination in the terms, conditions, and privileges of employment in violation of the New York State Human Rights Law.

165.     Defendants Swiftly and Kim have treated Plaintiff less well than other employees at least in part because of her sex.

166.     Based at least in part on her sex, Plaintiff was treated differently from and worse than others in a way that was more than trivial, insubstantial, or petty.

167.     Defendants' actions amount to willful or wanton negligence, and/or recklessness,

and/or exhibit a conscious disregard for the rights of Plaintiff, and/or constitute conduct so reckless as to amount to such disregard.

168.    As a result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

169.    Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of hardships between Plaintiff and Defendants, entitle Plaintiff to an equitable remedy such as a temporary restraining order reinstating her, which would not disserve the public.

170.    As a result of Defendants' unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law, including injunctive relief, back pay, front pay (if injunctive relief is denied), compensatory damages, punitive damages, attorneys' fees and costs, and/or other appropriate relief.

## EIGHTH CLAIM FOR RELIEF
### Race Discrimination in Violation of the New York State Human Rights Law
### N.Y. Exec. Law § 296(1)(a)
### (Against Defendants Swiftly and Kim)

171.    Plaintiff realleges by reference all facts alleged in the previous paragraphs as though fully set forth herein.

172.    Defendants Swiftly and Kim subjected Plaintiff to race discrimination in the terms, conditions, and privileges of employment in violation of the New York State Human Rights Law.

173.    Defendants Swiftly and Kim have treated Plaintiff less well than other employees at least in part because of her race.

174.    Based at least in part on her race, Plaintiff was treated differently from and worse

than others in a way that was more than trivial, insubstantial, or petty.

175.    Defendants' actions amount to willful or wanton negligence, and/or recklessness, and/or exhibit a conscious disregard for the rights of Plaintiff, and/or constitute conduct so reckless as to amount to such disregard.

176.    As a result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

177.    Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of hardships between Plaintiff and Defendants, entitle Plaintiff to an equitable remedy such as a temporary restraining order reinstating her, which would not disserve the public.

178.    As a result of Defendants' unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law, including injunctive relief, back pay, front pay (if injunctive relief is denied), compensatory damages, punitive damages, attorneys' fees and costs, and/or other appropriate relief.

## NINTH CLAIM FOR RELIEF
**National Origin Discrimination in Violation of the New York State Human Rights Law**
**N.Y. Exec. Law § 296(1)(a)**
**(Against Defendants Swiftly and Kim)**

179.    Plaintiff realleges by reference all facts alleged in the previous paragraphs as though fully set forth herein.

180.    Defendants Swiftly and Kim subjected Plaintiff to national origin discrimination in the terms, conditions, and privileges of employment in violation of the New York State Human Rights Law.

181.    Defendants Swiftly and Kim have treated Plaintiff less well than other employees at least in part because of her national origin.

182.    Based at least in part on her national origin, Plaintiff was treated differently from and worse than others in a way that was more than trivial, insubstantial, or petty.

183.    Defendants' actions amount to willful or wanton negligence, and/or recklessness, and/or exhibit a conscious disregard for the rights of Plaintiff, and/or constitute conduct so reckless as to amount to such disregard.

184.    As a result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

185.    Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of hardships between Plaintiff and Defendants, entitle Plaintiff to an equitable remedy such as a temporary restraining order reinstating her, which would not disserve the public.

186.    As a result of Defendants' unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law, including injunctive relief, back pay, front pay (if injunctive relief is denied), compensatory damages, punitive damages, attorneys' fees and costs, and/or other appropriate relief.

**TENTH CLAIM FOR RELIEF**
**Retaliation in Violation of the New York State Human Rights Law**
**N.Y. Exec. Law § 296(7)**
**(Against Defendants Swiftly and Kim)**

187.    Plaintiff realleges by reference all facts alleged in the previous paragraphs as though fully set forth herein.

188.     Plaintiff engaged in protected activity and Defendants Swiftly and Kim were aware of Plaintiff's protected activity.

189.     Among other things, Plaintiff opposed the unlawful treatment to which she and other employees at Swiftly were being subjected by (a) complaining to Mr. Kim and other employees and agents of Swiftly; (b) threatening to bring a lawsuit against Defendants Kim and Swiftly alleging sex discrimination, race discrimination, national origin discrimination, and retaliation; and (c) filing discrimination charges with the EEOC.

190.     The practices opposed by Plaintiff constitute colorable violations of the New York State Human Rights Law.

191.     Plaintiff suffered actions that would be reasonably likely to deter a person from engaging in protected activity.

192.     Among other things, Defendants Swiftly and Kim (a) sidelined Plaintiff from her primary job duties; (b) threatened to suspend Plaintiff; (c) in fact suspended Plaintiff; and (d) ultimately terminated Plaintiff.

193.     There was a causal connection between Plaintiff's protected activities and Defendants Swiftly and Kim's actions.

194.     Defendants Swiftly and Kim subjected Plaintiff to such actions because of and in retaliation for Plaintiff's protected activities.

195.     Defendants Swiftly and Kim's actions amount to willful or wanton negligence, and/or recklessness, and/or exhibit a conscious disregard for the rights of Plaintiff, and/or constitute conduct so reckless as to amount to such disregard.

196.     As a result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost future employment

opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

197.    Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of hardships between Plaintiff and Defendants, entitle Plaintiff to an equitable remedy such as a temporary restraining order reinstating her, which would not disserve the public.

198.    As a result of Defendants' unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law, including injunctive relief, back pay, front pay (if injunctive relief is denied), compensatory damages, punitive damages, attorneys' fees and costs, and/or other appropriate relief.

**ELEVENTH CLAIM FOR RELIEF**
**Aiding and Abetting in Violation of the New York State Human Rights Law**
**N.Y. Exec. L. § 296(6)**
**(Against Defendants Littler and Schmidt)**

199.    Plaintiff realleges by reference all facts alleged in the previous paragraphs as though fully set forth herein.

200.    As set forth above, Defendants Swiftly and Kim unlawfully retaliated against Plaintiff when, among other things, they placed her on leave and then terminated her.

201.    Defendants Littler and Schmidt actually participated in this unlawful retaliation against Plaintiff when (a) Ms. Schmidt advised Swiftly and Mr. Kim that they could place Ms. Ko on leave because she complained; (b) informed Plaintiff that she would be placed on involuntary leave and instructed her to do no work for Swiftly nor contact any Swiftly employees pending an investigation; and (c) delivered Ms. Ko's termination notice three days after Ms. Ko filed EEOC charges against all Defendants.

202.    Defendants Littler and Schmidt persisted in this course of conduct even after Mr.

Kornblith informed Ms. Schmidt that it violated the NYSHRL.

203.    By reason of the foregoing conduct, Littler and Ms. Schmidt aided and abetted Defendants Swiftly and Kim in their unlawful retaliation against Plaintiff, in violation of the NYSHRL.

204.    The aforementioned aiding and abetting by Littler and Ms. Schmidt was intentional.

205.    As a result of Littler and Schmidt's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and non-economic damages.

206.    Plaintiff has additionally suffered irreparable injury that remedies available at law, such as monetary damages, are inadequate to compensate for and that, considering the balance of hardships between Plaintiff and Defendants, entitle Plaintiff to an equitable remedy such as a temporary restraining order reinstating her, which would not disserve the public.

### TWELFTH CLAIM FOR RELIEF
**Violation Of Title VII of the Civil Rights Act Of 1964, as Amended—
Gender Discrimination in Terms and Conditions of Employment
42 U.S.C. § 2000e et seq.
(against Defendant Swiftly)**

207.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

208.    Defendant Swiftly has discriminated against Plaintiff by subjecting her to different treatment on the basis of her gender, including, but not limited to, by terminating her employment.

209.    Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly situated male employees and by subjecting her to disparate terms and conditions of employment in violation of Title VII, including, but not limited to, by

terminating her employment.

210.    Defendant's differential treatment of Plaintiff is a direct and proximate result of gender discrimination.

211.    Defendant has failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination in the workplace.

212.    As a result of Defendant's unlawful discrimination, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

213.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief. Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

### THIRTEENTH CLAIM FOR RELIEF
**Violation Of Title VII of the Civil Rights Act Of 1964, as Amended—
National Origin Discrimination in Terms and Conditions of Employment
42 U.S.C. § 2000e et seq.
(against Defendant Swiftly)**

214.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

215.    Defendant Swiftly has discriminated against Plaintiff by subjecting her to different treatment on the basis of her national origin, including, but not limited to, by terminating her employment.

216.    Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly situated non-Korean employees and by subjecting her to disparate terms and conditions of employment in violation of Title VII, including, but not limited to, by terminating her employment.

217.    Defendant's differential treatment of Plaintiff is a direct and proximate result of national origin discrimination.

218.    Defendant has failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of national origin discrimination in the workplace.

219.    As a result of Defendant's unlawful discrimination, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

220.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief. Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

### FOURTEENTH CLAIM FOR RELIEF
**Violation Of Title VII of the Civil Rights Act Of 1964, as Amended—
Race Discrimination in Terms and Conditions of Employment
42 U.S.C. § 2000e et seq.
(against Defendant Swiftly)**

221.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

222.    Defendant Swiftly has discriminated against Plaintiff by subjecting her to different treatment on the basis of her race, including, but not limited to, by terminating her employment.

223.    Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly situated non-Asian employees and by subjecting her to disparate terms and conditions of employment in violation of Title VII, including, but not limited to, by terminating her employment.

224.    Defendant's differential treatment of Plaintiff is a direct and proximate result of race discrimination.

40

225.    Defendant has failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of race discrimination in the workplace.

226.    As a result of Defendant's unlawful discrimination, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

227.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief. Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**FIFTEENTH CLAIM FOR RELIEF**
**Violation of Title VII of the Civil Rights Act of 1964, as Amended—**
**Retaliation**
**42 U.S.C. § 2000e-5(f), et seq.**
**(against Defendant Swiftly)**

228.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

229.    Plaintiff engaged in protected activity, and Defendant was aware of Plaintiff's protected activity. Among other things, Plaintiff opposed the unlawful treatment to which she was being subjected by complaining to Defendant Kim, complaining to all Defendants in a letter from her attorney, and filing an EEOC charge.

230.    Defendant Swiftly retaliated against Plaintiff for engaging in protected activity. Among other things, Defendant Swiftly excluded Plaintiff from key job responsibilities, involuntarily placed Plaintiff on leave, and terminated her employment.

231.    There was a causal connection between Plaintiff's protected activities and Defendant Swiftly' s retaliatory actions. Defendant's retaliatory acts were a direct and proximate result of Plaintiff's protected activities.

232.    Defendant Swiftly's retaliatory acts were materially adverse, and such acts would dissuade a reasonable person from engaging in a protected activity.

233.    Defendant Swiftly's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Plaintiff's rights, entitling her to punitive damages.

234.    As a result of Defendant's unlawful retaliation, Plaintiff will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

235.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief. Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**SIXTEENTH CLAIM FOR RELIEF**
**Violation of Section 1981 of the Civil Rights Act of 1866, as Amended—**
**Race Discrimination**
**42 U.S.C. § 1981**
**(against Defendant Swiftly)**

236.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

237.    Defendant Swiftly has discriminated against Plaintiff by subjecting her to different treatment on the basis of her race, including, but not limited to, by terminating her employment.

238.    Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly situated non-Asian employees and by subjecting her to disparate terms and conditions of employment in violation of Section 1981, including, but not limited to, by terminating her employment.

239.    Defendant's differential treatment of Plaintiff is a direct and proximate result of race discrimination.

240.    Defendant has failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of race discrimination in the workplace.

241.    As a result of Defendant's unlawful discrimination, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

242.    Plaintiff is entitled to all legal and equitable remedies available for violations of Section 1981, including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief. Attorneys' fees should be awarded under 42 U.S.C. § 1988.

**SEVENTEENTH CLAIM FOR RELIEF**
**Violation of Section 1981 of the Civil Rights Act of 1866, as Amended—**
**Retaliation**
**42 U.S.C. § 1981**
**(against Defendant Swiftly)**

243.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

244.    Plaintiff engaged in protected activity, and Defendant was aware of Plaintiff's protected activity. Among other things, Plaintiff opposed the unlawful treatment to which she was being subjected by complaining to Defendant Kim, complaining to all Defendants in a letter from her attorney, and filing an EEOC charge.

245.    Defendant Swiftly retaliated against Plaintiff for engaging in protected activity. Among other things, Defendant Swiftly excluded Plaintiff from key job responsibilities, involuntarily placed Plaintiff on leave, and terminated her employment.

246.    There was a causal connection between Plaintiff's protected activities and Defendant Swiftly' s retaliatory actions. Defendant's retaliatory acts were a direct and proximate result of Plaintiff's protected activities.

247.    Defendant Swiftly's retaliatory acts were materially adverse, and such acts would dissuade a reasonable person from engaging in a protected activity.

248.    Defendant Swiftly's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Plaintiff's rights, entitling her to punitive damages.

249.    As a result of Defendant's unlawful retaliation, Plaintiff will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

250.    Plaintiff is entitled to all legal and equitable remedies available for violations of Section 1981, including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief. Attorneys' fees should be awarded under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:

A.  A declaratory judgment that the practices complained of herein are unlawful and violate New York Labor Law § 740, the New York City Human Rights Law, the New York State Human Rights Law, Title VII, and Section 1981 of the Civil Rights Act of 1866;

B.  an injunction preventing Defendants from terminating Plaintiff and ordering her reinstatement;

C.  an award of damages, including back pay, front pay, compensatory damages, and punitive damages;

D.  an award of litigation costs and expenses, including reasonable attorneys' fees;

E.  an award of pre-judgment and post-judgment interest; and

F.  such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated:  March 4, 2025                              Respectfully submitted,

                                                   /s/ Russell Kornblith
                                                   Jeremy Heisler (JH-0145)
                                                   Russell Kornblith (RK-1950)
                                                   Miranda Katz (6016075)
                                                   **SANFORD HEISLER SHARP**
                                                   **MCKNIGHT, LLP**
                                                   17 State Street, 37th Floor
                                                   New York, New York 10004
                                                   Telephone: (646) 402-5646
                                                   Facsimile: (646) 402-5651
                                                   jheisler@sanfordheisler.com
                                                   rkornblith@sanfordheisler.com
                                                   mkatz@sanfordheisler.com

                                                   Counsel for Plaintiff Jiin Ko